# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

United States Courts
Southern District of Texas
F I L E D

NOV 06 2019

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ' | |
| | ' | |
| **v.** | ' | **CRIMINAL NO.** |
| | ' | |
| **TOWER RESEARCH CAPITAL LLC,** | ' | |
| **Defendant.** | ' | **19-819** |

## DEFERRED PROSECUTION AGREEMENT

Defendant Tower Research Capital LLC (the "Company"), pursuant to authority granted

by the Company's members reflected in Attachment B, and the United States Department of

Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the

Southern District of Texas (collectively, the "Fraud Section and the Office"), enter into this

deferred prosecution agreement (the "Agreement").

### Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the Fraud Section and the Office will

file the attached one-count criminal Information in the United States District Court for the

Southern District of Texas charging the Company with commodities fraud, in violation of Title

18, United States Code, Section 1348(1).  In so doing, the Company: (a) knowingly waives its

right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth

Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and

Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect

to venue to any charges by the United States arising out of the conduct described in the

Statement of Facts attached hereto as Attachment A and consents to the filing of the Information,

as provided under the terms of this Agreement, in the United States District Court for the

Southern District of Texas.  The Fraud Section and the Office agree to defer prosecution of the

Company pursuant to the terms and conditions described below.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, members, employees, and agents as charged in the Information, and as set forth in the attached Statement of Facts, and that the allegations described in the Information and the facts described in the attached Statement of Facts are true and accurate.  Should the Fraud Section and the Office pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the attached Statement of Facts in any proceeding, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

## Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term").  The Company agrees, however, that, in the event the Fraud Section and the Office determine, in their sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section and the Office, in their sole discretion, for up to a total additional time period of one year, without prejudice to the right of the Fraud Section and the Office to proceed as provided in Paragraphs 25-29 below.  Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period.  Conversely, in the event the Fraud Section and the Office find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be

terminated early.

## **Relevant Considerations**

4.      The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a.      the Company did not receive voluntary disclosure credit because it did not voluntarily and timely disclose to the Fraud Section and the Office the conduct described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts");

b.      the Company received full credit for its cooperation with the investigation conducted by the Fraud Section and the Office, including conducting a thorough internal investigation, making regular factual presentations to the Fraud Section and the Office, voluntarily making employees available for interviews, and collecting, analyzing, and organizing voluminous evidence and information for the Fraud Section and the Office;

c.      the Company provided to the Fraud Section and the Office all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Statement of Facts;

d.      the Company engaged in extensive remedial measures, including swiftly moving in early 2014 to terminate the traders involved in the conduct described in the attached Statement of Facts.  The Company enhanced its compliance program and internal controls to ensure they were designed to deter and detect spoofing, commodities fraud, and other types of market manipulation through, among other things, (i) substantial investments in staffing and resources for the Company's legal and compliance teams; (ii) updated policies, procedures, and supervisory structures with a specific emphasis on the prohibitions against spoofing; (iii) expanded compliance training on spoofing and market

manipulation including annual compliance training to all traders that covers spoofing and the issuance of bulletins and alerts regarding new regulatory developments and enforcement cases; and (iv) significant investments in sophisticated trade surveillance tools that are supported by a dedicated compliance staff and a team of in-house developers. In addition, the Company made changes to its senior management and revised the Company's corporate governance structure;

e.      the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

f.      accordingly, after considering (a) through (e) above, the Company received an aggregate discount of 25 percent off of the bottom of the otherwise-applicable United States Sentencing Guidelines fine range for purposes of calculating the appropriate Criminal Monetary Penalty under this Agreement;

g.      based on the Company's remediation and the state of its compliance program, the fact that the conduct described in the attached Statement of Facts concluded in 2013, and the Company's agreement to report to the Fraud Section and the Office as set forth in Attachment D to this Agreement (Corporate Compliance Reporting), the Fraud Section and the Office determined that an independent compliance monitor was unnecessary;

h.      the nature and seriousness of the offense conduct, which involved thousands of episodes of unlawful trading activity by three traders employed by the

Company between March 2012 and December 2013 and approximately $32,593,849 of loss to market participants;

      i.     the Company has no prior criminal history;

      j.     the Company has agreed to continue to cooperate with the Fraud Section and the Office as set forth in Paragraph 5, below; and

      k.     the Company has resolved with the United States Commodity Futures Trading Commission ("CFTC") through a proceeding pursuant to Section 6(c) and (d) of the Commodity Exchange Act, relating to the conduct described in the Statement of Facts.

**Future Cooperation and Disclosure Requirements**

5.     The Company shall cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct related to violations of the Commodity Exchange Act, Title 7, United States Code, Section 1, *et seq.*, and the commodities fraud statute, Title 18, United States Code, Section 1348 (collectively and hereafter, the "Commodities Laws") that is under investigation by the Fraud Section and the Office until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the term specified in paragraph 3. At the request of the Fraud Section and the Office, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company, its affiliates, or any of its present or former officers, members, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct related to violations of the Commodities Laws. The Company's cooperation pursuant to

this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Fraud Section and the Office a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such an assertion. The Company agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

     a.    The Company shall truthfully disclose all factual information with respect to its activities, those of its affiliates, and those of its present and former members, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section and the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section and the Office, upon request, any document, record or other tangible evidence about which the Company has knowledge or about which the Fraud Section and the Office may inquire of the Company.

     b.    Upon request of the Fraud Section and the Office, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section and the Office the information and materials described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

     c.    The Company shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, members, employees, agents and consultants of the Company. This obligation

includes, but is not limited to, sworn testimony before a federal grand jury or in federal

trials, as well as interviews with domestic or foreign law enforcement and regulatory

authorities.  Cooperation under this Paragraph shall include identification of witnesses

who, to the knowledge of the Company, may have material information regarding the

matters under investigation.

        d.      With respect to any information, testimony, documents, records or other

tangible evidence provided to the Fraud Section and the Office pursuant to this

Agreement, the Company consents to any and all disclosures to other governmental

authorities, including United States authorities and those of a foreign government of

such materials as the Fraud Section and the Office, in their sole discretion, shall deem

appropriate.

6.      In addition to the obligations in Paragraph 5, during the Term, should the

Company learn of any evidence or allegation of conduct that may constitute a violation of the

Commodities Laws, the Company shall promptly report such evidence or allegation to the Fraud

Section and the Office.

## Total Criminal Monetary Amount

7.      The Company and the Fraud Section and the Office agree that the Total Criminal

Monetary Amount to be paid by the Company pursuant to this Agreement is $67,493,849, which

is comprised of the following components set forth below:  (1) a Criminal Monetary Penalty in

the amount of $24,400,000; (2) a Criminal Disgorgement Amount of $10,500,000; and (3) a

Victim Compensation Payment Amount of $32,593,849.

8.      The Fraud Section and the Office agree that the amount of the Criminal Monetary

Penalty and Criminal Disgorgement will be offset by the amount of any payment made pursuant

to the order and settlement between the Company and the CFTC relating to the conduct described in the attached Statement of Facts.

9.      The Company acknowledges that no tax deduction may be sought in connection with the payment of any of the components of the Total Criminal Monetary Amount.  The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Total Criminal Monetary Amount or any disgorgement amounts that the Company pays pursuant to any other agreement entered into with an enforcement authority or regulator, including the CFTC, concerning the facts set forth in the attached Statement of Facts.

### **Payment of Criminal Monetary Penalty**

10.      The Fraud Section and the Office and the Company agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

    a.      The November 1, 2018 USSG are applicable to this matter.

    b.      <u>Offense Level</u>.  Based upon USSG § 2B1.1, the total offense level is 33, calculated as follows:

| (a)(1) | Base Offense Level | 7 |
|---|---|---|
| (b)(1)(L) | Loss Exceeds $25,000,000 | +22 |
| (b)(2)(A)(i) | More Than 10 Victims | +2 |
| (b)(10)(c) | Sophisticated Means | +2 |
| **TOTAL** | | 33 |

    c.      <u>Base Fine</u>.  Based upon USSG § 8C2.4(a), the base fine is $32,593,849 (the pecuniary loss under USSG § 8C2.4(a)(3), which is greater than the $22,000,000 fine indicated in the Offense Level Fine Table under §8C2.4(a)(1))

    d.    Culpability Score.  Based upon USSG § 8C2.5, the culpability score is 5, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(4) | the organization had 50 or more employees and an individual within substantial authority personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +2 |
| (g)(2) | the organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 2 |
| **TOTAL** | | 5 |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $32,593,849 |
| Multipliers | 1 (min) / 2 (max) |
| Fine Range | $32,593,849 / $65,187,698 |

11.    The Company agrees to pay a criminal monetary penalty in the amount of $24,400,000 (representing a reduction of approximately 25 percent off the low-end of the above calculated fine range) to the United States Treasury no later than ten (10) business days after the Agreement is fully executed (hereafter, the "Criminal Monetary Penalty") pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.  The Company and the Fraud Section and the Office agree that this Criminal Monetary Penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4.

12.    The $24,400,000 Criminal Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section and the Office that $24,400,000 is the maximum fine that may be imposed in any future prosecution,

and the Fraud Section and the Office are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section and the Office agree that under those circumstances, they will recommend to the Court that any amount paid as part of the Criminal Monetary Penalty should be offset against any fine the Court imposes as part of a future judgment.

## Payment of Criminal Disgorgement Amount

13.     The Company agrees that the overall profits earned from the Relay Team's trading activity, including the conduct set forth in the Statement of Facts, is at least $10,500,000. The Company hereby agrees to disgorge to the United States the sum of $10,500,000 (the "Criminal Disgorgement Amount").  The Company shall pay the Criminal Disgorgement Amount no later than ten (10) business days after the Agreement is fully executed, pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.

14.     The Criminal Disgorgement Amount paid is final and shall not be refunded should the Fraud Section and the Office later determine that the Company has breached this Agreement and commence a prosecution against the Company.  In the event of a breach of this Agreement and subsequent prosecution, the Fraud Section and the Office may pursue additional disgorgement and civil and criminal forfeiture in excess of the Criminal Disgorgement Amount. The Fraud Section and the Office agree that in the event of a subsequent breach and prosecution, they will recommend to the Court that the amounts paid pursuant to this Agreement be offset against whatever disgorgement the Court shall impose as part of its judgment.  The Company understands that such a recommendation will not be binding on the Court.

## Payment of Victim Compensation Amount

15.     The Company agrees to pay the amount of $32,593,849 in order to compensate victims for their losses as set forth in Paragraph 4(h) above (hereafter, the "Victim Compensation Amount"). The Company shall pay the full Victim Compensation Amount to the United States no later than ten (10) business days after the Agreement is signed pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.

16.     The Fraud Section and the Office shall serve as the claims administrator for making victim compensation payments, and shall have sole discretion to determine how the Victim Compensation Amount will be disbursed.

17.     The Company is currently a defendant in a putative class action captioned *Boutchard v. Gandhi, et. al*, No. 18-cv-7041 (N.D. Ill.) (the "Class Action"). In the event of a settlement or judgment in the Class Action or any other class action based on similar allegations, at any time during the Term and at the Company's request, the Fraud Section and the Office will consider, in their sole discretion, whether any members of the class are entitled to a victim compensation payment from the Victim Compensation Amount and, if so, whether any portion of the Victim Compensation Amount shall be used to pay class members in full or partial satisfaction of the settlement or judgment. No portion of the Victim Compensation Amount shall be paid out for attorney's fees in the Class Action or any other class action based on similar allegations.

18.     The Company agrees that any unclaimed part of the Victim Compensation Amount remaining at the end of the Term shall revert to the United States in the form of an additional Criminal Monetary Penalty.

## **Conditional Release from Liability**

19.     Subject to Paragraphs 25-29, the Fraud Section and the Office agree, except as

provided in this Agreement, that they will not bring any criminal or civil case against the Company relating to any of the conduct described in the attached Statement of Facts or the criminal Information filed pursuant to this Agreement. The Fraud Section and the Office, however, may use any information related to the conduct described in the attached Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

      a.      This Agreement does not provide any protection against prosecution for any future conduct by the Company.

      b.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

### Corporate Compliance Program

20.     The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the Commodities Laws throughout its operations, including those of its affiliates agents, and joint ventures (to the extent that the Company manages or controls such joint ventures), and those of its contractors and subcontractors whose responsibilities relate to commodities trading or supervision of commodities trading, including, but not limited to, the minimum elements set forth in Attachment C.

21.     In order to address any deficiencies in its internal controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its

existing controls (including its trade surveillance tools), policies, and procedures regarding compliance with the Commodities Laws. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program, including a system of internal controls, designed to effectively detect and deter violations of the Commodities Laws. The compliance program, including the internal controls system, will include, but not be limited to, the minimum elements set forth in Attachment C.

## Corporate Compliance Reporting

22.     The Company agrees that it will report to the Fraud Section and the Office annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C. These reports will be prepared in accordance with Attachment D.

## Deferred Prosecution

23.     In consideration of the undertakings agreed to by the Company herein, the Fraud Section and the Office agree that any prosecution of the Company for the conduct set forth in the attached Statement of Facts be and hereby is deferred for the Term. To the extent there is conduct disclosed by the Company that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of, or relevant to, this Agreement.

24.     The Fraud Section and the Office further agree that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section and the Office will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire. Within six months after the Agreement's expiration, the Fraud Section and the Office shall seek dismissal with prejudice of the criminal

Information filed against the Company described in Paragraph 1, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts.

### Breach of the Agreement

25.     If, during the Term, the Company (a) commits any felony under United States federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 21 and 22 of this Agreement and Attachment C; or (e) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Fraud Section and the Office become aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section and the Office in the United States District Court for the Southern District of Texas or any other appropriate venue.  Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the sole discretion of the Fraud Section and the Office.  Any such prosecution may be premised on information provided by the Company or its personnel.  Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the

expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  In addition, the Company agrees that the statute of limitations as to any violation of the Commodities Laws that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

26.     In the event the Fraud Section and the Office determine that the Company has breached this Agreement, the Fraud Section and the Office agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Company.

27.     In the event that the Fraud Section and the Office determine that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Fraud Section and the Office or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings

brought by the Fraud Section and the Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current member, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section and the Office.

28.     The Company acknowledges that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.  The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

29.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the Fraud Section and the Office that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement.  Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

### Sale, Merger, or Other Change in Corporate Form of Company

30.     Except as may otherwise be agreed by the parties in connection with a particular

transaction, the Company agrees that in the event that, during the Term, it undertakes any change

in corporate form, including if it sells, merges, or transfers business operations that are material

to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates

involved in the conduct described in the attached Statement of Facts, as they exist as of the date

of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other

change in corporate form, it shall include in any contract for sale, merger, transfer, or other

change in corporate form a provision binding the purchaser, or any successor in interest thereto,

to the obligations described in this Agreement.  The purchaser or successor in interest must also

agree in writing that the ability of the Fraud Section and the Office to breach under this

Agreement is applicable in full force to that entity.  The Company agrees that the failure to

include these provisions in the transaction will make any such transaction null and void.  The

Company shall provide notice to the Fraud Section and the Office at least thirty (30) days prior

to undertaking any such sale, merger, transfer, or other change in corporate form.  The Fraud

Section and the Office shall notify the Company prior to such transaction (or series of

transactions) if it determines that the transaction(s) will have the effect of circumventing or

frustrating the enforcement purposes of this Agreement.  At any time during the Term the

Company engages in a transaction(s) that has the effect of circumventing or frustrating the

enforcement purposes of this Agreement, the Fraud Section and the Office may deem it a breach

of this Agreement pursuant to Paragraphs 25-29 of this Agreement.  Nothing herein shall restrict

the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in

interest for penalties or other costs arising from any conduct that may have occurred prior to the

date of the transaction, so long as such indemnification does not have the effect of circumventing

or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section

and the Office.

## **Public Statements by Company**

31.     The Company expressly agrees that it shall not, through present or future

attorneys, officers, members, employees, agents, or any other person authorized to speak for the

Company make any public statement, in litigation or otherwise, contradicting the acceptance of

responsibility by the Company set forth above or the facts described in the attached Statement of

Facts.  Any such contradictory statement shall, subject to cure rights of the Company described

below, constitute a breach of this Agreement, and the Company thereafter shall be subject to

prosecution as set forth in Paragraphs 25-29 of this Agreement.  The decision whether any public

statement by any such person contradicting a fact contained in the attached Statement of Facts

will be imputed to the Company for the purpose of determining whether it has breached this

Agreement shall be at the sole discretion of the Fraud Section and the Office.  If the Fraud

Section and the Office determine that a public statement by any such person contradicts in whole

or in part a statement contained in the attached Statement of Facts, the Fraud Section and the

Office shall so notify the Company, and the Company may avoid a breach of this Agreement by

publicly repudiating such statement(s) within five business days after notification.  The

Company shall be permitted to raise defenses and to assert affirmative claims in other

proceedings relating to the matters set forth in the attached Statement of Facts provided that such

defenses and claims do not contradict, in whole or in part, a statement contained in the attached

Statement of Facts.  This Paragraph does not apply to any statement made by any present or

former officer, member, employee, or agent of the Company in the course of any criminal,

regulatory, or civil case initiated against such individual, unless such individual is speaking on

behalf of the Company.

32.     The Company agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Fraud Section and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Office and the Company; and (b) whether the Fraud Section and the Office have any objection to the release.

33.     The Fraud Section and the Office agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the Fraud Section and the Office are not agreeing to advocate on behalf of the Company, but rather are agreeing to provide facts to be evaluated independently by such authorities.

### Limitations on Binding Effect of Agreement

34.     This Agreement is binding on the Company and the Fraud Section and the Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section and the Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.  The Company and the Fraud Section and the Office agree that if the Court rejects the Agreement, all the provisions of the Agreement shall be deemed null and void, and the Term shall be deemed to have not begun.

### Notice

35.     Any notice to the Fraud Section and the Office under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

> Sally Molloy
> Deputy Chief, Fraud Section
> Criminal Division, U.S. Department of Justice
> 1400 New York Avenue NW
> Washington, DC, 20005
>
> and
>
> John R. Lewis
> Assistant United States Attorney
> U.S. Attorney's Office
> Southern District of Texas
> 1000 Louisiana, Suite 2300
> Houston, TX 77002

Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

> William Iwaschuk
> General Counsel
> Tower Research Capital LLC
> 377 Broadway, 11th Fl.
> New York, NY 10013

Notice shall be effective upon actual receipt by the Fraud Section and the Office or the Company.

## **Complete Agreement**

36.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Fraud Section and the Office.  No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section and the Office, the attorneys for the Company and a duly authorized representative of the Company.

**AGREED:**

**FOR TOWER RESEARCH CAPITAL LLC:**

Date: 11/1/19                    By: _____

Mark Gorton
Manager
Tower Research Capital LLC

Date: 11/1/19                    By: _____

James J. Benjamin, Jr.
Michael A. Asaro
Charles F. Connolly
Akin Gump Strauss Hauer & Feld LLP
Counsel for Tower Research Capital LLC

Date: 11/1/19                    By: _____

Kenneth Raisler
Sullivan & Cromwell, LLP
Counsel for Tower Research Capital LLC


**FOR THE DEPARTMENT OF JUSTICE:**

ROBERT A. ZINK
Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: 11/4/19                    BY: _____

Matthew F. Sullivan
Trial Attorney

Avi Perry
Assistant Chief


RYAN K. PATRICK
United States Attorney
Southern District of Texas

Date: _____          BY: _____

John R. Lewis
Assistant United States Attorney

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Tower Research Capital LLC (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the members of the Company. I have advised and caused outside counsel for the Company to advise the members fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Manager for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: __11\1\19__

TOWER RESEARCH CAPITAL LLC

By: _____

Mark Gorton
Manager

## CERTIFICATE OF COUNSEL

I am counsel for Tower Research Capital LLC (the "Company") in the matter covered by

this Agreement.  In connection with such representation, I have examined relevant Company

documents and have discussed the terms of this Agreement with the Company members.  Based

on our review of the foregoing materials and discussions, I am of the opinion that the

representative of the Company has been duly authorized to enter into this Agreement on behalf

of the Company and that this Agreement has been duly and validly authorized, executed, and

delivered on behalf of the Company and is a valid and binding obligation of the Company.

Further, I have carefully reviewed the terms of this Agreement with the members and the

General Counsel of the Company.  I have fully advised them of the rights of the Company, of

possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering

into this Agreement.  To my knowledge, the decision of the Company to enter into this

Agreement, based on the authorization of the members, is an informed and voluntary one.

Date: __11 | 1 | 19__

By: _____
James J. Benjamin, Jr.
Michael A. Asaro
Charles F. Connolly
Akin Gump Strauss Hauer & Feld LLP
Counsel for Tower Research Capital LLC

By: _____
Kenneth Raisler
Sullivan & Cromwell, LLP
Counsel for Tower Research Capital LLC

ATTACHMENT A

**STATEMENT OF FACTS**

1.      The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of Texas (the "Office") and Tower Research Capital LLC (the "Company"). The Company hereby agrees and stipulates that the following information is true and accurate. The Company admits, accepts, and acknowledges that it is responsible for the acts of its officers, members, employees, and agents as set forth below. Should the Fraud Section and the Office pursue the prosecution that is deferred by this Agreement, the Company agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

2.      From approximately March 2012 until December 2013 (the "Relevant Period"), three traders who were employees of the Company and members of a trading team called the "Relay Team" engaged in a scheme to defraud in connection with the purchase and sale of commodities for future delivery, namely, E-Mini S&P 500 futures contracts, E-Mini Dow futures contracts, and E-Mini NASDAQ 100 futures contracts (collectively, "EMini futures contracts"). The three traders were Kamaldeep Gandhi, Krishna Mohan, and Yuchun ("Bruce") Mao (collectively, the "Relay Traders").

3.      On thousands of occasions throughout the Relevant Period, the Relay Traders fraudulently placed orders to buy and sell E-Mini futures contracts with the intent to cancel those orders before execution, including in an attempt to profit by deceiving other market participants.

4.      More specifically, the Relay Traders placed one or more orders for E-Mini futures contracts that they intended to execute ("Genuine Orders").  Often, the Genuine Orders were "iceberg" orders, meaning that other market participants could see only a portion of the order's full size at any given time.

5.      During the same trading sequences, the Relay Traders also placed one or more orders for E-Mini futures contracts that they intended to cancel before execution ("Deceptive Orders") on the opposite side of the market from the Genuine Orders.  The Deceptive Orders were not iceberg orders, and so the full order size was visible to other market participants.

6.      By placing Deceptive Orders, the Relay Traders intended to, and did, inject false and misleading information about the genuine supply and demand for E-Mini futures contracts into the markets, and to deceive other participants in those markets into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.

7.      This false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling E-Mini futures contracts at quantities, prices, and times that they otherwise likely would not have traded.

8.      By placing Deceptive Orders to *buy* E-Mini futures contracts, the Relay Traders intended to create the false impression in the market of increased demand in an effort to drive *up* the prices of those futures contracts.

9.      By placing Deceptive Orders to *sell* E-Mini futures contracts, the Relay Traders intended to create the false impression in the market of increased supply in an effort to drive *down* the prices of those futures contracts.

10.     In either situation, the Relay Traders placed Deceptive Orders with the intent to fraudulently and artificially move the price of a given E-Mini futures contract in a manner that would increase the likelihood that one or more of their own opposite-side Genuine Orders would be filled by other market participants, allowing the Relay Traders to generate trading profits and avoid losses for themselves and the Company.

11.     In placing Deceptive Orders to benefit their Genuine Orders, the Relay Traders were acting, at least in part, to benefit the Company and within the scope of their employment as employees of the Company.

ATTACHMENT B

**<u>SECRETARY'S CERTIFICATE</u>**

**TOWER RESEARCH CAPITAL LLC**

I, William Iwaschuk, do hereby certify that:

1. I am the duly appointed and acting Secretary of Tower Research Capital LLC, a limited liability company organized under the laws of the State of New York (the "Company");

2. The resolutions set forth below were duly adopted by unanimous consent of the Members on October 18, 2019 and remain in full force and effect as of the date hereof, and their contents have not been rescinded, annulled, revoked or modified in any respect:

WHEREAS, Tower Research Capital LLC (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") and the United States Attorney's Office for the Southern District of Texas (the "Office") regarding issues arising in connection with unlawful commodities trading activity by former employees of the Company; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section and the Office; and

WHEREAS, the Company's General Counsel, William Iwaschuk, together with outside counsel for the Company, have advised the Members of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section and the Office;

NOW, THEREFORE, BE IT RESOLVED, that:

1.     The Company (a) acknowledges the filing of the one-count Information charging the Company with commodities fraud, in violation of Title 18, United States Code, Section

1348(1) (the "Information"); (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section and the Office (the "Agreement"); and (c) agrees to pay a Total Criminal Monetary Amount of $67,493,849 under the Agreement with respect to the conduct described in the Information;

2.      The Company accepts the terms and conditions of the Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the Southern District of Texas; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement;

3.      The Manager of the Company, Mark Gorton, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by the members with such changes as the Manager of the Company, Mark Gorton, may approve;

4.      The Manager of the Company, Mark Gorton, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the

forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the Manager of the Company, Mark Gorton, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: __11|1|19__

By: _____
William Iwaschuk
Tower Research Capital LLC

ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Commodities Exchange Act, Title 7, United States Code, Sections 1, *et seq.*, and the commodities fraud statute, Title 18, United States Code, Section 1348 (collectively, the "Commodities Laws"), Tower Research Capital LLC (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program that is designed to deter and detect violations of the Commodities Laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

### *High-Level Commitment*

1.    The Company will ensure that its members and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the Commodities Laws and the Company's compliance code.

### *Policies and Procedures*

2.    The Company will develop and promulgate clearly articulated and visible corporate policies against violations of the Commodities Laws, which policy shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the Commodities Laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the Commodities Laws by personnel at all levels of the Company.  These policies and procedures shall apply to all members, officers, and employees.  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.

*Periodic Risk-Based Review*

4.      The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the Commodities Laws.

5.      The Company shall review their compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness.

*Proper Oversight and Independence*

6.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to the Company's members, or any appropriate committee of the Company's members, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

7.      The Company will implement mechanisms designed to ensure that its compliance code, policies, and procedures are effectively communicated to all members, officers, employees,

and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all members and officers, all employees in positions of leadership or trust, all commodities traders, and any positions that require such training (*e.g.*, internal audit, sales, legal, compliance, finance);and (b) corresponding certifications by all such members, officers, employees, commodities traders, agents and business partners, certifying compliance with the training requirements.

8.    The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to members, officers, employees, commodities traders, and, where necessary and appropriate, agents and business partners, on complying with the Company's compliance code, policies and procedures, including when they need advice on an urgent basis.

*Internal Reporting and Investigation*

9.    The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, members, officers, employees, and, where appropriate, agents and business partners concerning violations of the Commodities Laws or the Company's compliance code, policies, and procedures.

10.    The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the Commodities Laws or the Company's compliance code, policies, and procedures.

*Enforcement and Discipline*

11.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

12.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the Commodities Laws and the Company's compliance code, policies, and procedures by the Company's members, officers, and employees.  Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the member, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program is effective.

*Mergers and Acquisitions*

13.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence by legal, accounting, and compliance personnel.

14.     The Company will ensure their compliance code, policies, and procedures apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly (a) train the members, officers, employees, commodities traders, agents, and business partners consistent with Paragraphs 7-8; and (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with the Commodities Laws.

*Monitoring and Testing*

15.     The Company will conduct periodic reviews and testing of its compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of Commodities Laws and the Company's code, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.

16.     The Company will maintain, or where necessary establish, an effective trade surveillance program capable of detecting trading activity that has indicia of fraudulent, manipulative, or otherwise unlawful conduct.

ATTACHMENT D

**REPORTING REQUIREMENTS**

Tower Research Capital LLC (the "Company") agrees that it will report to the Fraud Section and the Office periodically, at no less than twelve-month intervals during a three-year term, regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Attachment C.  During this three-year period, the Company shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two (2) follow-up reviews and reports, as described below:

a. By no later than one year from the date this Agreement is executed, the Company shall submit to the Fraud Section and the Office a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve the Company's internal controls, policies, and procedures for ensuring compliance with the Commodities Exchange Act, Title 7, United States Code, Sections 1, *et seq.*, and the commodities fraud statute, Title 18, United States Code, Section 1348 (collectively, the "Commodities Laws"), and the proposed scope of the subsequent reviews.  The report shall be transmitted to:

Sally Molloy
Deputy Chief, Fraud Section
Criminal Division, U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20005

and

John R. Lewis
Assistant United States Attorney
U.S. Attorney's Office
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, TX 77002

The Company may extend the time period for issuance of the report with prior written approval of the Fraud Section and the Office.

      b.      The Company shall undertake at least two follow-up reviews and reports, incorporating the views of the Fraud Section and the Office on the Company's prior reviews and reports, to further monitor and assess whether the Company's policies and procedures are reasonably designed to detect and prevent violations of the Commodities Laws.

      c.      The first follow-up review and report shall be completed by no later than one year after the initial report is submitted to the Fraud Section and the Office.  The second follow-up review and report shall be completed and delivered to the Fraud Section and the Office no later than thirty days before the end of the Term.

      d.      The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section and the Office determine in their sole discretion that disclosure would be in furtherance of the Fraud Section's and the Office's discharge of their duties and responsibilities or is otherwise required by law.

      e.      The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Fraud Section and the Office.